1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| AMC TECHNOLOGY, LLC, )<br><br>                          Plaintiff, )<br><br>       v.                              )<br><br>CISCO SYSTEMS, INC.,           )<br><br>                          Defendant. )<br>———————————————— ) | Case No.: 11-CV-03403 PSG<br><br>**ORDER GRANTING-IN-PART<br>DEFENDANT CISCO SYSTEMS,<br>INC.'S MOTION TO DISMISS**<br><br>**(Re: Docket Nos. 30, 39)** |

Defendant Cisco Systems, Inc. ("Cisco") moves to dismiss the first amended complaint. Plaintiff AMC Technology, LLC ("AMC") opposes the motion.  On December 13, 2011, the parties appeared for hearing.  Having reviewed the papers and considered the arguments of counsel, Cisco's motion to dismiss is GRANTED-IN-PART with leave to amend.

## I.  BACKGROUND

The allegations of the first amended complaint and its exhibits are as follows.

Cisco develops, sells and markets certain software for use by contact centers that receive, process, and route customer phone calls, texts, and other communications.  Cisco's products include Unified Contact Center ("UCC") and Unified Intelligent Contact Management ("ICM").  Customers who purchase UCC and ICM often rely on customer relationship management ("CRM") software developed by other companies, including Microsoft, Oracle, Salesforce, SAP, PeopleSoft and Siebel, among others.  In order to integrate Cisco's software with third-party CRM software,

1

**United States District Court**
For the Northern District of California

1    contact centers must procure additional software known as connectors or adapters. AMC develops

2    and licenses connectors and adapters.

3          Between October 2006 and September 2007, Cisco and AMC engaged in extensive

4    negotiations regarding Cisco's interest in licensing certain existing and future AMC products.

5    During the negotiations, Cisco advised AMC that it intended to discontinue an adapter it then made

6    for Siebel CRM software (the "Cisco Siebel Adapter").  Cisco did not want to develop the Cisco

7    Siebel Adapter for newer versions of Siebel software not supported by its current adapter.  Cisco

8    wanted AMC to develop a seamless replacement to the current adapter that replicated its features

9    and functionality (the "AMC Siebel Adapter"). Cisco also offered to migrate its existing customers

10   using the Cisco Siebel Adapter to the AMC Siebel Adapter.

11         On October 2, 2007, the parties entered into an original equipment manufacturer contract

12   (the "OEM Agreement").  Under the OEM Agreement, AMC was to provide Cisco with the non-

13   exclusive right to license AMC's existing Multi-Channel Integration Suite ("MCIS"), for use with

14   UCC, ICM and other software.  In return, Cisco agreed to pay AMC a lump sum and other

15   royalties.  AMC thus stood to gain substantial revenue from providing the adapter software and

16   from collecting maintenance fees and revenue for providing technical support to existing and new

17   Cisco customers. In addition, AMC was to provide Cisco with valuable sales pipeline information

18   and to license to Cisco most of AMC's other adapters on highly favorable terms.  AMC also was

19   permitted to continue to sell connectors and adapters under its own brand name. The parties also

20   agreed that AMC would develop a connector to allow MCIS to interconnect with Cisco's UCCX

21   software (the "AMC UCCX Connector").

22         AMC subsequently developed and delivered the AMC Siebel Adapter and all of the

23   deliverables attendant to the AMC Siebel Adapter, including Siebel functional specifications and

24   other documentation set forth in Section 3.2 of the OEM Agreement and the accompanying

25   Statement of Work. Under the OEM Agreement and the accompanying Statement of Work, AMC

26   was required to comply with specific testing and delivery requirements. Pursuant to Section 3.2 of

27   the OEM Agreement, if there were any purported deficiencies in the deliverables, Cisco was

28   obliged to provide written notice of rejection.  It never did so.

**United States District Court**
For the Northern District of California

1    Over the next three years, Cisco refused AMC's efforts at every turn to move forward with

2    the AMC Siebel Adapter.  Moreover, Cisco failed to discontinue the Cisco Siebel Adapter and to

3    migrate the existing customers to the AMC Siebel Adapter.

4    AMC also attempted to deliver to Cisco the AMC UCCX Connector.  Like the AMC Siebel

5    Adapter, under the OEM Agreement and Statement of Work, the AMC UCCX Connector had to

6    meet certain functional specifications. Despite AMC meeting all of these specifications, however,

7    Cisco refused to accept the AMC UCCX Connector.  AMC sought again – unsuccessfully -- to

8    resolve any purported issues with Cisco regarding the product.  Cisco continued, however, to enjoy

9    the benefit of reselling AMC's other software.

10

11   As part of the OEM Agreement, Cisco also was required to accept periodic maintenance

12   software releases and distribute them to end users. Cisco refused to accept the AMC maintenance

13   releases and distribute them to end users.  As a result, many end users experienced malfunctions in

14   their software and contacted Cisco to complain. Cisco falsely stated to these end users that the

15   apparent malfunctions were caused by defective AMC software and that AMC's software was of

16   poor quality, when in fact the apparent malfunctions resulted from Cisco's failure to distribute

17   AMC's maintenance releases.

18

19   Cisco also made numerous false statements to its customers regarding the quality of AMC's

20   software describing it as faulty and unstable.  As a result of Cisco's false statements, customer

21   relationships were damaged, and other potential partnership opportunities were lost.

22   On October 3, 2011, and in light of the foregoing, AMC filed a first amended complaint

23   alleging: (1) promissory fraud; (2) breach of contract; (3) promissory estoppel; (4) breach of the

24   covenant of good faith and fair dealing; (5) negligent misrepresentation; (6) fraud; (7) trade libel;

25   (8) product disparagement; (9) slander; and (10) unfair competition.

26

27

28

Case No.:  C 11-3403 PSG
ORDER GRANTING-IN-PART CISCO'S MOTION TO DISMISS

## II. LEGAL STANDARDS

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[1]   While "detailed factual allegations are not required, a complaint must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."[2]   In other words, a complaint must have sufficient factual allegations to "state a claim for relief that is plausible on its face."[3]   A claim is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[4]   Accordingly, under Fed. R. Civ. P. 12(b)(6), which tests the legal sufficiency of the claims alleged in the complaint, "[d]ismissal can based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."[5]

When evaluating a Rule 12(b)(6) motion, the court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party.[6]   Review of a motion to dismiss is limited to the face of the complaint, materials incorporated into the complaint by reference, and matters of which the court may take judicial notice.[7]   The court is not required to accept "legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged."[8]   Further, the court need not accept as true

---

[1]     Fed. R. Civ. P. 8(a)(2).

[2]     *Ashcroft v. Iqbal,* ___U.S.___, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

[3]     *Id.* at 1940 (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

[4]     *Id.* at 1940.

[5]     *Balistreri v. Pacifica Police Dep't.,* 901 F.2d 696, 699 (9th Cir. 1990).

[6]     *See Metzler Inv. GMBH v. Corinthian Colls, Inc.,* 540 F.3d 1049, 1061 (9th Cir. 2008).

[7]     *See id.* at 1061.

[8]     *Clegg v. Cult Awareness Network,* 18 F.3d 752, 754-55 (9th Cir. 1994).

Case No.:   C 11-3403 PSG
ORDER GRANTING-IN-PART CISCO'S MOTION TO DISMISS

allegations that contradict matters that are either subject to judicial notice or attached as exhibits to the complaint.[9]

Under Rule 9(b), claims of fraud are held to a higher pleading standard.[10]  A "party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."[11]  "A motion to dismiss a complaint or claim 'grounded in fraud' under Rule 9(b) for failure to plead with particularity is the functional equivalent of a motion to dismiss under Rule 12(b)(6) for failure to state a claim."[12]

"Dismissal with prejudice and without leave to amend is not appropriate unless it is clear that the complaint could not be saved by amendment."[13]  If dismissing with prejudice, a district court's failure to consider the factors relevant to whether amendment should be permitted and failure to articulate why dismissal should be with prejudice instead of without prejudice may constitute an abuse of discretion.[14]

## III. DISCUSSION

### A.     First Claim: Promissory Fraud

AMC alleges that Cisco never intended to perform its promises to discontinue the Cisco Siebel Adapter and to accept the AMC Siebel Adapter even if AMC had met the specifications and requirements set forth in the OEM Agreement and the Statement of Work.[15]  AMC further alleges that Cisco made these promises to AMC solely to obtain its valuable sales pipeline information and

---

[9]     *See In re Gilead Sciences Securities Litig.,* 536 F.3d 1049, 1055 (9th Cir. 2008).

[10]    Fed. R. Civ. P. 9(b).

[11]    *See id.*

[12]    *See Vess v. Ciga-Geigy Corp, USA,* 317 F.3d 1097, 1107 (9th Cir. 2003).

[13]    *Eminence Capital, LLC v. Asopeon, Inc.,* 316 F.3d 1048, 1052 (9th Cir. 2003).

[14]    *See id.* at 1052.

[15]    *See* First Amended Complaint (Docket No. 34) ¶¶ 49, 52.

Case No.:  C 11-3403 PSG
ORDER GRANTING-IN-PART CISCO'S MOTION TO DISMISS

United States District Court
For the Northern District of California

1    to resell AMC's other software, for which Cisco would pay very little.[16] All this, says AMC, was

2    nothing less than promissory fraud.

3            Cisco argues that an allegation of its intent not to be bound by its promises is insufficient,

4    and that AMC must instead allege facts that demonstrate such an intent.

5            AMC concedes that while nonperformance alone is insufficient to plead or prove a

6    promissory fraud claim, fraudulent intent can be established by circumstantial evidence, including

7    the immediate non-performance of the promise, failure to attempt performance, and an

8    unwillingness to work with the other party.  In other words, the issue of fraudulent intent is one for

9    the trier of fact to determine based on particular facts evidencing Cisco's intent.

10           The court agrees with Cisco that AMC does not allege its promissory fraud claim with

11   adequate particularity.  A claim of "promissory fraud is not exempted from the strictures of Rule

12   9(b), and a plaintiff is required to plead 'facts from which the Court can infer that the allegedly

13   fraudulent statements were actually false when made.'"[17] A plaintiff has "failed to plead fraud with

14   specificity as required by Rule 9(b)" by merely alleging that "[defendant] had no intention to be

15   bound by the terms as agreed."[18] "[A] plaintiff must point to facts which show that defendant

16   harbored an intention not to be bound by terms of the contract at formation."[19] While AMC alleges

17   that Cisco never intended to perform its obligations under the OEM Agreement, it fails to allege

18   any actions by Cisco that substantiate that Cisco harbored such an intent at the time it entered the

---

[16]     *See id,* ¶¶ 21, 30-31.

[17]     *Hsu v. OZ Optics,* 211 F.R.D. 615, 620 (N.D. Cal. 2002) (citations omitted); *see also* Fed. R. Civ. P. 9(b).

[18]     *See id.*

[19]     *Hsu,* 211 F.R.D. at 620; *see also Tenzer v. Superscope,* 39 Cal. 3d 18, 30 (1985).

Case No.:   C 11-3403 PSG
ORDER GRANTING-IN-PART CISCO'S MOTION TO DISMISS

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

agreement.[20] At best, the amended complaint offers only Cisco's non-performance of less than all its obligations – something altogether different and insufficient for a promissory fraud claim.[21] Cisco's motion to dismiss the promissory fraud claim is granted with leave to amend.

**B.      Second Claim: Breach of Contract**

AMC alleges that Cisco breached the OEM Agreement four ways: (1) Cisco initially failed to accept or reject the AMC Siebel Adapter and ultimately to accept an adapter; (2) Cisco failed to offer its customers the opportunity to migrate to the AMC Siebel Adapter that met the OEM requirements; (3) Cisco failed to accept the AMC UCCX Connector; and (4) Cisco failed to accept the AMC maintenance software releases.

**1.      AMC Siebel Adapter: Acceptance/Rejection**

Cisco argues that the first alleged breach of contract fails because AMC has failed to allege that that the deliverables it provided to Cisco passed all the tests set forth in the Statement of Work. Section 3.2 of the OEM Agreement states that "in order to be accepted by Cisco," all deliverables must pass the tests set forth in the Statement of Work. In the first amended complaint, AMC alleges that it "conducted" tests but does not specifically allege that the adapter "passed" the applicable tests.

AMC responds that Section 3.2 of the agreement imposes an obligation on Cisco to accept or reject software no matter its sufficiency after the software has been delivered. AMC also disputes that each and every checklist item in the acceptance criteria of the OEM Agreement must be recited to establish that all of its delivery obligations had been met before Cisco failed to perform.

---

[20]      *Cf. Nikoonahad v. Rudolph Tech., Inc.,* Case No. 08-2290 JF, 2009 WL 150948, at *6 (N.D. Cal. Jan. 21, 2009) ("Nikoonahad must allege facts sufficient to show that Rudolph concealed ill-will or harbored an intent not to be bound by the agreement at the time of formation").

[21]      *See Tenzer,* 39 Cal.3d at 30 ("something more than nonperformance is required to prove the defendant's intent not to perform his promise"); *Cf. Locke v. Warner Bors., Inc.,* 57 Cal.App. 4th 354 (1997) (holding that failure to attempt performance of any obligation may be sufficient circumstantial evidence of intent not to be bound by agreement).

7

United States District Court
For the Northern District of California

1    The court agrees with AMC.  The plain language of Section 3.2 required a response by

2  Cisco within 15 days regardless of AMC's compliance with the tests: "[U]pon delivery . . . [Cisco]

3  will determine whether the Deliverables conform to the applicable part of the specifications and

4  Statement of Work [and] will accept or reject each Deliverable within fifteen (15) days after

5  delivery." Even if compliance were required, AMC alleges that "[it] fully performed any and all

6  terms, obligations and conditions on its part in the OEM, or was excused from such performance

7  by Cisco's prior breach of the OEM."  As Cisco concedes in footnote 1 of its reply brief, this is

8  sufficient.[22]

9        2.  **AMC Siebel Adapter: Migration**

10       Cisco argues that even if AMC satisfied all of the delivery requirements for the AMC

11 Siebel Adapter, AMC has failed to identify any specific provision in the OEM Agreement that

12 requires Cisco to migrate its end users from the Cisco Siebel Adapter to the AMC Siebel Adapter.

13       AMC responds that rather than reflecting any failure to adequately plead breach, the issue is

14 one of contract interpretation and that relevant, extrinsic evidence will support AMC's

15 interpretation of the OEM Agreement and Cisco's obligations under the agreement to migrate its

16 end users to the AMC Siebel Adapter.

17       The court agrees with Cisco. While AMC argues that relevant, extrinsic evidence will

18 support its interpretation that Cisco was obligated to migrate its customers, AMC has not identified

19 any language in the OEM Agreement that plausibly reflects that obligation.  The mere suggestion

20 that extrinsic evidence could create an ambiguity is not sufficient where there is no language in the

21 contract that is reasonably susceptible to the meaning allegedly supported by that evidence.[23]

22 Cisco's motion to dismiss this part of the breach of contract claim is granted with leave to amend.

23 ─────────────

24  [22]      With respect to this and each of AMC's breach of contract claims, the court further rejects
   Cisco's argument that the claims are barred by the OEM Agreement's limitation of liability
25  provision.  That provision does not appear to bar general damages for lost profits, but only special
   damages for lost profits – something AMC does not claim. *Cf. First Magnus Fin. Corp. v. WNS*
   *North Am.,* 2010 Bankr. LEXIS 5023, *15, 18 (9th Cir. Aug. 3, 2010).

26  [23]      *See In re Facebook DPC Advertising Litigation,* 709 F.Supp.2d 762, 769 (N.D. Cal. 2010)
27  ("plaintiffs thus must do more than claim the written agreement is ambiguous; they must point to
   specific words in the written agreement"); *Schoemahl v. Renaissance Elec. Co., Inc.,* 334 Fed.
28  Appx. 772, 777 (8th Cir. 2009) ("simply suggesting that some evidence might produce a latent
   ambiguity, however, is insufficient to survive a motion to dismiss").

Case No.:  C 11-3403 PSG
ORDER GRANTING-IN-PART CISCO'S MOTION TO DISMISS

United States District Court
For the Northern District of California

3.   **AMC UCCX Connector**

Cisco disputes whether the AMC UCCX Connector is even a deliverable as defined by the OEM Agreement, such that it was obligated to accept or reject it.  The agreement defines a deliverable as any tangible or intangible items to be delivered by AMC to Cisco pursuant to a Statement of Work. According to Cisco, the AMC UCCX Connector was not made a part of any Statement of Work and was expressly excluded from the OEM Agreement because it was not yet ready.

AMC responds that the UCCX Connector is among the products that Cisco intended to license from AMC under the OEM because the OEM Agreement and the Statement of Work refer to it repeatedly as such under a variety of synonyms, including "UCCX," "CCX," "Unified Contact Center Express," and "Contact Center Express."  AMC points to Section 1.1 of Attachment A that states that Cisco will be licensing the "Cisco Contact Center Express," Section 3.2 that describes the royalty obligations for the "Contact Center Express," and Section 3.4 that describes the attendant maintenance fee for the same product.  AMC also points to Section 5.1.1 of the Statement of Work (OEM Attachment A, Exhibit A) that describes the testing regime for a "live CCX . . . system."

AMC has adequately pled a claim for breach of contract here.  It is sufficient that AMC alleges that the AMC UCCX Connector met all of the conditions required of a deliverable – including incorporation into a Statement of Work -- before Cisco failed to perform.[24]  Whether or not the connector is indeed a deliverable as defined by the OEM Agreement is of course ultimately an issue of fact, but it is not one of inadequate pleading.  Cisco's motion to dismiss this part of the claim is denied.

4.   **AMC Maintenance Software Releases**

Cisco argues that there simply is nothing in the OEM Agreement that required it to accept AMC's maintenance software releases.

---

[24]      *Cf. Orlando v. Carolina Cas. Ins. Co.,* Case No. 07-92 AWI, 2007 U.S. Dist. LEXIS 56409, at *15 (E.D. Cal. July 20, 2007) (holding dismissal improper unless plaintiff has "fail[ed] to allege the satisfaction, waiver or excuse of a condition precedent").

9

United States District Court
For the Northern District of California

In response, AMC points to OEM Attachment A, section 3.4, under which Cisco was obligated to pay AMC a maintenance fee and AMC was obligated to provide Cisco's customers "technical support, bug fixes, product updates, and new versions." AMC alleges that it complied with its obligations under this section by periodically releasing product updates, bug fixes and other releases referred collectively as "maintenance releases." AMC argues that the parties agreed that Cisco would resell AMC's software on an OEM basis and that AMC would not have any direct relationship with customers. According to AMC, it was therefore "obvious" that Cisco had an affirmative obligation to distribute the maintenance releases to customers as AMC released them.

While it may be obvious to AMC, it is not obvious to the court in light of a careful review of Section 3.7 of OEM Attachment A. Even AMC concedes that there is no express provision obligating Cisco to distribute AMC's maintenance releases when it argues that the obligation is "so obvious and fundamental to the nature of the OEM relationship and the provision of software maintenance, that the parties did not need to spell it out explicitly."[25] Cisco's motion to dismiss this part of the breach of contract claim is granted with leave to amend.

## C.    Third Claim: Promissory Estoppel

AMC alleges that, if Cisco's promise to AMC that it would discontinue the Cisco Siebel Adapter and migrate users to the AMC Siebel Adapter is not an express term in the OEM Agreement, then the promise was instead an extra-contractual promise on which AMC detrimentally relied. In support of its allegation, AMC attached to the complaint (1) a presentation dated May 21, 2007; (2) an email dated June 7, 2007 from Willem Evert Nijenhouse, the Cisco employee responsible for marketing the project, to Anthony X. Uliano, President and Chief Technology Officer of AMC, stating that Cisco was planning to make an end-of-life ("EOL") announcement of Cisco's current Siebel adapter on September 1, 2007 (meaning the Cisco product

---

[25]    *See* Docket No. 41 at 11.

Case No.:  C 11-3403 PSG
ORDER GRANTING-IN-PART CISCO'S MOTION TO DISMISS

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

would be sold until March 1, 2008 and the software maintained and supported by Cisco until March 2009) and that Cisco would migrate to the AMC Siebel Adapter; and (3) another email dated September 25, 2007 from Mr. Nijenhuis to Mr. Uliano, stating that one of Cisco's largest Siebel customers, DirecTV was planning to migrate to Siebel 8.0 in 2008, and that DirecTV telephony systems would migrate to the AMC Siebel Adapter and that DirecTV would require licenses for an estimated 8,000 to 12,000 agents.

Cisco argues that this promissory estoppel claim fails because the OEM Agreement contains an integration clause that precludes consideration of any prior or contemporaneous promises outside the contract. The integration clause specifies that the OEM Agreement and its exhibits "constitute the entire agreement between the parties with respect to the subject matter [t]hereof, and supersedes and replaces all prior and contemporaneous understandings or agreements, written or oral, regarding such subject matter."[26]

AMC responds that the integration clause is of no consequence because Cisco's promise to migrate users to the Siebel Adapter does not contradict any express provision of the OEM Agreement.

The court agrees with Cisco. Even if Cisco's promise was clear and all the other elements of a promissory estoppel claim met,[27] the integration clause by its terms bars any extra-contractual promises regarding its subject matter. That subject matter plainly includes the AMC Siebel Adapter, meaning that any non-contemporaneous understanding regarding the parties' rights and obligations concerning the AMC Siebel Adapter must stand or fall based on the agreement.[28] Cisco's motion to dismiss the claim for promissory estoppel is granted with leave to amend.

---

[26]   *See* Docket No. 34, Exh. D.

[27]   *See Toscano v. Greene Music,* 124 Cal.App. 4th 685, 692 (2004).

[28]   *Cf. EPA Real Estate Partnership v. Kang,* 12 Cal.App. 4th 171, 176-77 (1992) ("[W]hen the parties intend a written agreement to be the final and complete expression of their understanding, that writing becomes the final contract between the parties").

11

**D.      Fourth Claim: Breach of the Implied Covenant of Good Faith and Fair Dealing**

AMC alleges that Cisco breached an implied covenant of good faith and fair dealing in the

agreement by:

> (1) failing to comply with the provision in the OEM requiring Cisco to accept or reject
> the AMC Siebel Adapter; (2) making false promises with respect to its intention to EOL
> the Cisco Siebel Adapter and transition its customers to the AMC Siebel Adapter; (3)
> failing to provide end customers with AMC's maintenance releases and updates; and (4)
> failing to provide to AMC the fundamental benefits that the parties agreed AMC would
> receive under the OEM.

Cisco argues that while a party holding discretionary powers under a contract must exercise

such powers in good faith, it may not be barred from doing that which is expressly permitted by an

agreement.

AMC responds that Cisco has no express right not to distribute the AMC software, and that

its covenant claim is directed to Cisco's bad faith denial of its undisputed express right to earn

additional royalties and good will from Cisco's distribution of AMC software.

The court agrees with AMC. California recognizes an implied covenant of good faith and

fair dealing in every contract.  The covenant is not endowed with an existence independent of its

contractual underpinnings.  It supplements express contractual covenants in order to prevent a party

from engaging in discretionary conduct that, while not technically transgressing express covenants,

frustrates the other party's rights to the benefits of the contract.[29] A party breaches the covenant

with an act that "unfairly frustrates the agreed common purposes [of the contract] and disappoints

the reasonable expectations of the other party."[30]

Here, AMC alleges that by wholly refusing to work with AMC altogether, Cisco deprived

AMC of the opportunity to recoup its investment by collecting the maintenance, royalty, and

upgrade fees that might have flowed therefrom had Cisco accepted the Adapter. Whatever the

ultimate merits of the claim, Cisco has no affirmative right not to distribute AMC software that

---

[29]      *See Racine & Laramie, Ltd. V. Dept. of Parks & Recreation,* 11 Cal.App. 4th 1026, 1031-32 (1992).

[30]      *See Celador Int'l Ltd. v. The Walt Disney Co.,* 347 F.Supp. 2d 846, 852 (C.D. Cal. 2004).

12

Case No.:  C 11-3403 PSG
ORDER GRANTING-IN-PART CISCO'S MOTION TO DISMISS

1    might negate the covenant claim based on the same.  If proven, this is just the type of bad faith

2    exercise of discretion the good faith and fair dealing covenant prohibits.[31]  Cisco's motion to

3    dismiss this claim is denied.

4    **E.      Fifth Claim: Negligent Misrepresentation**

5            AMC alleges that prior to the execution of the OEM Agreement, Cisco made the following

6    material misrepresentations: (1) that it presently intended to accept the AMC Siebel Adapter if it

7    met all the specifications set forth in the Statement of Work; (2) that it would EOL the Cisco Siebel

8    Adapter; or (3) that Cisco would migrate its customers to the AMC Siebel Adapter.

9            Cisco argues that like the claim for promissory fraud, AMC fails to allege sufficient facts

10   with particularity to support its negligent misrepresentation claim.  According to Cisco, nothing in

11   the operative complaint suggests that Cisco lacked reasonable grounds for believing that it intended

12   to accept the AMC Siebel Adapter if all delivery and testing requirements in the Statement of Work

13   were met, that it would discontinue the Cisco Siebel Adapter, or that it would migrate Cisco's

14   customers to the AMC Siebel Adapter.

15           AMC responds simply by pointing to its allegations and urging the inference that Cisco has

16   no reasonable grounds for its misrepresentations based on Cisco's non-performance and refusal to

17   work with AMC.

18           The court agrees with Cisco that AMC has not pled this claim with sufficient particularity.

19   Under California law, the elements of negligent misrepresentation are the same as those for fraud

20   "with the exception that the defendant need not actually know the representation is false.  Rather,

21   to plead negligent misrepresentation, it is sufficient to allege that the defendant lacked reasonable

22   grounds to believe the representation was true."[32]  In the Ninth Circuit, "claims for fraud and

23   negligent misrepresentation must meet Rule 9(b)'s particularity requirement."[33]  While AMC

---

24   [31]    *Cf. Pasadena Live, LLC v. City of Pasadena,* 114 Cal.App.4th 1089, 1093 (2004) (holding
25   that defendant breached implied covenant by refusing to consider plaintiff's proposed productions
     when the contract "envisioned that [plaintiff would] at least have the opportunity to apply for
26   approval of its productions in order to seek to recoup its investment").

27   [32]    *Neilsen v. Union Bank of California, N.A.,* 290 F.Supp.2d 1101, 1141 (C.D. Cal. 2003).

28   [33]    *See id.*

Case No.:  C 11-3403 PSG
ORDER GRANTING-IN-PART CISCO'S MOTION TO DISMISS

United States District Court
For the Northern District of California

1    alleges that Mr. Nijenhouse and Mr. Botting of Cisco made the misrepresentations, it does not

2    allege particular facts supporting the necessary inference that they lacked reasonable grounds to

3    believe the representation was true.[34]  Cisco's motion to dismiss the claim for negligent

4    misrepresentation is granted with leave to amend.

5    **F.     Sixth Claim: Fraud**

6            AMC alleges that Cisco committed fraud by making numerous misrepresentations,

7    including that it would accept the AMC Siebel Adapter if it conformed to the specifications set

8    forth in the Statement of Work, that it would EOL the Cisco Siebel Adapter, and that it would

9    migrate its customers to the AMC Siebel Adapter, without ever intending to fulfill those

10   obligations.

11           Like the claim for promissory fraud, Cisco argues that fraud has not been pleaded with

12   sufficient particularity especially because all of the alleged misrepresentations made by Cisco

13   reflect only present intent.

14           AMC responds that it is sufficient under California law to allege fraud by misrepresentation

15   of present intent.

16           Once again, the court agrees with Cisco.  Under Rule 9(b), claims of fraud are held to a

17   higher pleading standard.  The circumstances constituting fraud or mistake must be pleaded with

18   particularity.  Even if California law recognizes a fraud claim based on present intent,[35] as

19   explained previously, AMC has not alleged sufficient facts from which one can reasonably

20   conclude that Cisco intended to commit fraud at the time of the formation of the OEM Agreement.

21   Cisco's motion to dismiss the fraud claim is granted with leave to amend.

22   **G.     Seventh and Eighth Claims: Commercial Disparagement and Slander**

23           AMC alleges that it was commercially disparaged and slandered when Cisco made false

24   statements to its representatives and customers that AMC's software was of poor quality and

25   caused customers' systems to malfunction, when in fact the malfunctions resulted from Cisco's

---

[34]     AMC has cited no precedent supporting the notion that under California law non-performance is sufficient to meet the pleading requirements for a negligent misrepresentation claim, and the court has found none.

[35]     *See, e.g., Universal By-Products, Inc. v. City of Modesto,* 43 Cal. App. 3d 145, 152 (1974).

14

Case No.:   C 11-3403 PSG
ORDER GRANTING-IN-PART CISCO'S MOTION TO DISMISS

United States District Court
For the Northern District of California

1    failure to accept and distribute the AMC maintenance releases. AMC alleges that these false

2    statements caused false perceptions that AMC products are faulty and unstable and caused AMC to

3    lose partnership opportunities.  AMC offers specific examples of customers, potential customers or

4    reseller relationships that were impacted by Cisco's false statements.

5           Cisco disputes that AMC has sufficiently identified the substance of the statements at issue.

6    Cisco also disputes that AMC has adequately pleaded two required elements for a disparagement or

7    slander claim: (1) actual malice; and (2) special damages.

8           AMC responds that it has alleged that Cisco's statements directly injured AMC's reputation

9    and caused AMC to lose partnership opportunities and direct customers.  Because Cisco made

10   statements knowing they were false or with reckless disregard, and because its allegations

11   specifically identify customers or transactions lost as a result of disparagement, AMC contends

12   they are sufficiently pleaded.  Because these allegations constitute slander per se, special damages

13   are not an element of this claim.  With respect to the special damages requirement of a claim for

14   commercial disparagement, AMC again notes that it has specifically alleged customers and

15   business partners that it has lost, resulting in damages of at least $380,000.

16          The court agrees with AMC that the necessary elements about which Cisco raises concerns

17   have been adequately pleaded.  AMC alleges that even though Cisco knew that AMC had provided

18   it with periodic maintenance releases for Cisco to distribute to customers to avoid malfunctions,

19   Cisco's employees and its representatives nevertheless made statements to customers such as

20   Ameritrade and Nexus IS knowing they were false or with reckless disregard.  This is sufficient to

21   establish both the substance of the statements at issue and actual malice.[36] In addition, AMC has

22   adequately pleaded the element for special damages.  Statements such as those alleged by AMC

23   "tending directly to injure a plaintiff in respect to the plaintiff's business by imputing something

24   with reference to the plaintiff's business that has a natural tendency to lessen its profits"[37] are

25   slander per se, requiring no proof of special damages. As for AMC's disparagement claim, it is true

---

26   [36]    *See Luxpro Corp. v. Apple, Inc.,* Case No. 10-3058 JSW, 2011 U.S. Dist. LEXIS 35000, at
27   *13 (N.D. Cal. Mar. 29, 2011); *Melaleuca, Inc. v. Clark,* 66 Cal. App. 4th 1344, 1358-1362 (1998).

28   [37]    *Mann v. Quality Old Time Serv., Inc.,* 120 Cal.App.4th 90, 107 (2004).

Case No.:  C 11-3403 PSG
ORDER GRANTING-IN-PART CISCO'S MOTION TO DISMISS

that to establish commercial disparagement the "pleader must specifically identify the customers or transactions lost as a result of the disparagement,"[38] AMC, however, has specifically alleged that Cisco's statements caused AMC to lose TD Ameritrade and Nexus IS as customers and business partners, resulting in damages of at least $380,000 annually from the lost contract. This is sufficient. Cisco's motion to dismiss the commercial disparagement and slander claims is denied.

**H.      Tenth [*sic.*] Claim: Unfair Competition**

AMC alleges that Cisco made false and misleading statements regarding AMC's software that constitute slander and commercial disparagement and satisfy the requirements for an unfair competition claim.

Cisco argues that because both the commercial disparagement and slander claims fail so too must the unfair competition claim.

AMC responds that both claims have been adequately pled and therefore the unfair competition claim survives.

Because the court has rejected Cisco's challenge to AMC's claims for commercial disparagement and slander – its only basis for its challenge to AMC's unfair competition claim – it must also reject the unfair competition claim challenge. Cisco's motion to dismiss the unfair competition claim is denied.

**IV. CONCLUSION**

Cisco's motion to dismiss is granted-in-part with leave to amend.  An amended complaint shall be filed no later than February 10, 2012.

**IT IS SO ORDERED.**

Dated:    1/20/2012

_Paul S. Grewal_
PAUL S. GREWAL
United States Magistrate Judge

---

[38]      *See Zero Motorcycles, Inc. v. Pirelli Tyre S.p.A.,* Case No. 10-1290 SBA, 2011 WL 2844397, at *6 (N.D. Cal. Jul. 18, 2011).

Case No.:  C 11-3403 PSG
ORDER GRANTING-IN-PART CISCO'S MOTION TO DISMISS