United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

9

SAN JOSE DIVISION

10
11
12
13
14
15

| | | |
|---|---|---|
| AMC TECHNOLOGY, LLC, | ) | Case No.: 11-cv-3403 PSG |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING-IN-PART** |
| v. | ) | **CISCO'S MOTION FOR SUMMARY** |
| | ) | **JUDGMENT AND DENYING AMC'S** |
| CISCO SYSTEMS, INC., | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT** |
| Defendant. | ) | |
| | ) | **(Re: Docket Nos. 103, 110)** |
| | ) | |

16

        In this commercial dispute, Defendant Cisco Systems, Inc. ("Cisco") moves for summary

17

judgment.[1]  Plaintiff AMC Technology, LLC ("AMC") opposes, and has filed a summary

18

judgment motion of its own, on both its affirmative claims and Cisco's counterclaims.[2]  Having

19

considered the papers and oral arguments of counsel, the court GRANTS-IN-PART Cisco's motion

20

for summary judgment and DENIES AMC's motion for summary judgment.

21
22

## I.      BACKGROUND

23

        Cisco develops and sells software to customer contact centers so that they can receive,

24

process, and route customer phone calls, texts, and other communications.  These products include

25

Unified Contact Center Express ("UCCX"), which is marketed to small businesses, and Unified

26

───────────────

27

[1] *See* Docket No. 103.

28

[2] *See* Docket No. 110.

Case No.: 11-3403 PSG
ORDER

Contact Center Enterprise ("UCCE"), which is marketed to larger businesses. Businesses that purchase these products often also use customer relationship management ("CRM") database software, typically developed by other companies such as Microsoft, Oracle, and Salesforce. To integrate Cisco's software with third-party CRM software, Cisco's customers need additional connector or adapter software. AMC develops and licenses these connectors and adapters.

## A.   Cisco and AMC Agree to a Deal

In 2007, Cisco and AMC entered into a software development and licensing agreement ("Agreement") whereby AMC agreed to modify a number of its existing connector or adapter software products according to Cisco's specifications, and Cisco agreed to license both modified software and standard software.[3] The purpose was to resell the adapted products under the Cisco brand.[4]

The Agreement refers to the AMC software products to be modified as "Deliverables,"[5] that are described pursuant to a "Statement of Work."[6] The first Statement of Work is attached as Exhibit A to the Agreement and lists specific products to be developed,[7] resources to be provided by Cisco,[8] content requirements for the Deliverables,[9] and a delivery schedule for the Deliverables.[10] The contract also contemplates future Statements of Work, which would add Deliverables to the relationship:

---

[3] *See* Docket No. 111, Ex. 14.

[4] *See id.*

[5] *See id.* § 1.6.

[6] *See id.* § 1.22.

[7] *See id.*, Ex. A § 2.

[8] *See id.* § 3.

[9] *See id.* § 5.1.1.

[10] *See id.* § 5.1.2.

2

Case No.: 11-3403 PSG
ORDER

Additional Statements of Work.  If Cisco desires to engage Licensor for additional services which are not included in the Statement of Work and which do not constitute merely a revision or modification of the Statement of Work, the parties shall in good faith negotiate additional Statement of Work, each of which upon signing shall be deemed a part of this Agreement.  Additional Statements of Work shall be entered into by mutual agreement between Cisco and Licensor and shall be substantially in the form of the Statement of Work attached hereto.  Each Statement of Work shall be signed by authorized representatives of the parties.  This Agreement may cover more than one Statement of Work at any given time.[11]

The Agreement also specifies the process for delivery and rejection or acceptance of any Deliverable.  The way it was supposed to work is this.  AMC develops the Deliverable according to a specification and delivers it according to the schedule provided in the Statement of Work.[12] Cisco then reviews the Deliverable and within 15 days provides written notice of its acceptance or rejection.[13]  If Cisco rejects the Deliverable, Cisco must provide written notice describing the deficiencies not conforming to the Agreement specifications in "sufficient detail" for AMC to correct them.[14]  AMC in turn corrects such deficiencies within 30 days, provided that AMC is not delayed by "conditions outside its reasonable control."[15]  This feedback loop is to continue at least two more times, at which point Cisco is free to issue a final rejection.[16]  If Cisco issues a final rejection of the Deliverable, AMC is to return any and all compensation already paid by Cisco for that Deliverable and the Statement of Work terminates.[17]  Cisco then has the option to terminate the Agreement with written notice.[18]

_____

[11] *See id.* § 3.11.

[12] *See id.*, Ex. B and Ex. A § 5.1.1.

[13] *See id.* § 3.2.

[14] *Id.*

[15] *Id.*

[16] *See id.*

[17] *See id.*

[18] *See id.*

3

Case No.: 11-3403 PSG
ORDER

As things turned out, AMC successfully developed a number of Deliverables under the Agreement, which were accepted by Cisco and sold without issue. The parties have quarreled, however, over two products – the "Siebel Adapter" and the "UCCX Connector" – giving rise to the current suit.

**B.    AMC Develops the Siebel Adapter**

The first Statement of Work called for AMC to develop the Siebel Adapter.[19]  Originally, the Statement of Work called for the Siebel Adapter work to be completed in two phases, the first ending on September 14, 2007 and the second on October 31, 2007.[20]  The parties later agreed to an amended development schedule, with delivery of the functional specification by October 29, 2007, delivery of test plan and results by October 31, 2007, delivery of software on a gold CD by November 2, 2007, and final testing of the software at Cisco's lab in Boxborough, Massachusetts during the week of November 5, 2007.[21]

On October 26, 2007, AMC sent an email to Cisco purporting to delivery the functional specification.[22]  On October 29, 2007, Cisco responded by inquiring whether AMC had sent the wrong document because the purported functional specification appeared to it to be nothing more than a feature summary.[23]  AMC confirmed that it provided the correct document.[24]  On October 30, 2007, AMC sent the test plans, supplementing them on November 2, 2007.[25]  During the week

---

[19] *See id.*, Ex. A § 5.1.1.

[20] *See id.* § 5.1.2.

[21] *See id.,* Ex. 7.

[22] *See id.,* Ex. 8.

[23] *See* Docket No. 104, Ex. 9.

[24] *See id.*

[25] *See* Docket No. 111, Ex. 17-19.

Case No.: 11-3403 PSG
ORDER

of November 5, 2007, AMC sent its engineers to test the software.[26]  Cisco was dissatisfied with the shipment and on November 12, 2007 sent AMC a report identifying a list of issues for AMC to address.[27]  Two days later, AMC responded, saying it had fixed 21 of the issues and was working on the rest.[28]  On November 19, 2007, Cisco informed AMC that Cisco was discussing the Siebel Adapter internally and that it was "leaning" towards conducting an audit of AMC's testing and lab resources.[29]  Cisco recommended that AMC "continue to solidify the Siebel [A]dapter with a goal of being able to present a product that has extended testing and a high pass rate."[30]  On November 30, 2007, AMC informed Cisco that of the 55 issues identified by Cisco, all but six were either duplicates, non-issues, "potential upgrades," or were resolved.[31]  The remaining six included one error yet to be fixed, one error that AMC needed to test on Cisco systems to fix, and four errors that required Cisco input.[32]  Cisco did not respond to AMC's email.

Internally, on or around November 14, 2007, Cisco decided to "Re-Execute Commit" ("Re-EC") to the Siebel Adapter project and completely "revisit requirements, functional spec, gap analysis" of the project.[33]  Re-EC is an internal Cisco process that essentially halts all work on the project and turns resources elsewhere.[34]  Cisco then reevaluates the project, its requirements, and a

---

[26] *See id.*, Ex. 20.

[27] *See id.*, Ex. 21.

[28] *See id.*, Ex. 22.

[29] *See* Docket No. 104, Ex. 15.

[30] *See id.*

[31] *See* Docket No. 111, Ex. 29.

[32] *See id.*

[33] *See id.*, Ex. 24.

[34] *See id.*, Ex. 1 at 183:17-184:11.

5

Case No.: 11-3403 PSG
ORDER

potential new schedule for completion of the project.[35]  Cisco later communicated this intent to AMC.[36]

Cisco never completed the Re-EC process.[37]  At a meeting in March 2008, Cisco determined that no resources were available for the AMC Siebel Adapter project.[38]  AMC asked Cisco several times over the course of the next year or so whether the project would proceed, but Cisco explained it did not have enough resources.[39]  The project was never revived.

## C. **The UCCX Connector Languishes**

The UCCX Connector was not in the Summary of Development in the first Statement of Work.[40]  In original drafts, the UCCX Connector was included, but it was taken out by AMC's lawyer during contract negotiations.[41]  Some references to "UCCX" and "CCE/CCX" remained, however, in other parts of the Agreement and the Statement of Work, including the royalty payments schedule, a list of both standard and developed software to be licensed, and criteria for functional testing.[42]  Although AMC asked for updates on the UCCX Connector project, Cisco stated it did not have the resources to pursue the project and it never went forward.[43]

---

[35] *Id.*, Ex. 5 at 79:23-80:7.

[36] *See id.*, Ex. 25.

[37] *See, e.g, id.* at 81-82.

[38] *See id.*, Ex. 37.

[39] *See id.,* Ex. 5 at 279:24-280:21.

[40] *See id.*, Ex. 14, Ex. A § 1.1.

[41] *See* Docket No. 104, Ex. 31.

[42] *See* Docket No. 111, Ex. 14, Ex A § 1.1, 3.1, 5.1.12.

[43] *See id.*, Ex. 5 at 279:24-280:21; Ex. 38.

Case No.: 11-3403 PSG
ORDER

**D.**     **Litigation Looms and Then Commences**

On August 2, 2011, AMC sent Cisco notice of AMC's intent to terminate the Agreement "due to Cisco's material violations" of the contract.[44]  Among other issues, the letter alleges that Cisco breached the contract with respect to both the Siebel Adapter and UCCX Connector.[45]  On September 6, 2011, AMC sent a letter to Cisco terminating the Agreement.[46]

On October 3, 2011, AMC filed a first amended complaint ("FAC") alleging ten claims.[47]  After the court granted-in-part Cisco's motion to dismiss the FAC and the parties stipulated to dismissal of certain claims, all that remains of the FAC are AMC's claims for breach of contract and breach of the covenant of good faith and fair dealing regarding the Siebel Adapter and the UCCX Connector.[48]  Cisco filed counterclaims for breach of contract and breach of the covenant of good faith and fair dealing.[49]

## II.    LEGAL STANDARDS

Summary judgment is appropriate only if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[50]  There are two distinct steps to a motion for summary judgment.  The moving party bears the initial burden of production by identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a triable issue of material fact.[51]  Where the moving party has the burden of proof at trial, he

---

[44] *Id.,* Ex. 54.

[45] *See id.*

[46] *See* Docket No. 104, Ex. 40.

[47] *See* Docket No. 34.

[48] *See* Docket No. 64.

[49] *See* Docket No. 77.

[50] Fed. R. Civ. P. 56(a).

[51] *See* Fed. R. Civ. P. 56(c)(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Case No.: 11-3403 PSG
ORDER

must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party."[52]  If the moving party does not bear the burden of proof at trial, however, he may satisfy his burden of proof either by proffering "affirmative evidence negating an element of the non-moving party's claim," or by showing the non-moving party has insufficient evidence to establish an "essential element of the non-moving party's claim."[53]  If the moving party meets its initial burden, the burden of production then shifts to the non-moving party, who must then provide specific facts showing a genuine issue of material fact for trial.[54]  A material fact is one that might affect the outcome of the suit under the governing law.[55]  A dispute is "genuine" if the evidence is such that reasonable minds could differ and find for either party.[56]

At this stage, the court does not weigh conflicting evidence or make credibility determinations.[57]  Thus, in reviewing the record, the court must construe the evidence and the inferences to be drawn from the underlying evidence in the light most favorable to the non-moving party.[58]

---

[52] *Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th Cir. 2007).

[53] *Celotex*, 477 U.S. at 331.

[54] *See id.* at 330; *T.W. Elec. Service, Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 630, 630 (9th Cir. 1987).

[55] *See Anderson*, 477 U.S. at 248.

[56] *See Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1436 (9th Cir. 1987).

[57] *T.W. Elec. Serv., Inc.*, 809 F.2d at 630.

[58] *See Anderson*, 477 U.S. at 248; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

Case No.: 11-3403 PSG
ORDER

### III.   DISCUSSION

**A.   AMC's Breach of Contract Claims**

 **1.   Siebel Adapter**

As the party with the burden of proof at trial, to secure summary judgment on its breach of contract claims regarding the Siebel Adapter, AMC must prove "affirmatively demonstrate that no reasonable trier of fact could find other than" in its favor on every element of this claim.[59]   Cisco not only opposes the motion, but further urges that summary judgment should be granted in its favor because AMC has insufficient evidence to establish at trial at least one essential element of its claim.[60]   Given these dueling motions on the Siebel Adapter breach claim, the question before the court is simple – construing the evidence in favor of each party, could a reasonable jury to find in favor of that party?   Because court finds that the answer is yes, neither party is entitled to summary judgment.

Here's why.   At its heart, AMC's breach of contract claim on the Siebel Adapter alleges that Cisco failed to properly engage in the accept-or-reject process for this Deliverable.   To prove breach of contract, a plaintiff must demonstrate (1) the existence of a contract, (2) plaintiff's performance, or excuse for nonperformance, and (3) the defendant's breach.[61]

AMC and Cisco both agree that the Siebel Adapter was a Deliverable under the Agreement, meaning the terms of the Agreement governed each party's duties regarding the Siebel Adapter. Where they disagree is whether AMC performed under the contract, or was excused from performing, and whether Cisco breached the contract by failing to perform.

---

[59] *Soremekun,* 509 F.3d at 984.

[60] *Celotex*, 477 U.S. at 331.

[61] *See Hamilton v. Greenwich Investors XXVI LLC*, 195 Cal.App.4th 1602, 1614 (2011).

Case No.: 11-3403 PSG
ORDER

Before delving into the particular facts surrounding the Siebel Adapter delivery, a review of the relevant terms of the Agreement is warranted. The Statement of Work attached to the Agreement requires more than just software. Instead, each Deliverable be comprised of the following:

(1) "Modifications to Licensor's Multi-Channel Integration Suite to ensure such Software complies with the Specifications" (i.e. the software itself),

(2) "Certifications of the Software from all CRM vendors that provide a formal certification program. Copies of the certificates shall be delivered to Cisco" ("third-party certification"),

(3) "Functional Specifications and other documentation as set out in the Agreement and Exhibits thereto, including but not limited to: product description, design guide, installation guide, configuration and administration guide, and trouble shooting guide" (the "functional specifications"), and

(4) "[S]uch testing and quality assurance of the Software as agreed in writing with Cisco or as reasonably requested by Cisco" ("testing results").[62]

### a.  *First Delivery*

AMC asserts it delivered the Siebel Adapter according to its obligations under the contract. On November 5, 2007, AMC delivered the modified Siebel Adapter software to Cisco.[63] On October 26, 2007, AMC delivered what it contends were the functional specifications.[64] On October 30, 2007, AMC delivered test results.[65] On November 2, 2007, AMC delivered additional user documentation.[66] Although AMC did not deliver the third-party certification, which in this case would be provided by Oracle, AMC claims that Oracle could not issue the third-party certification until Cisco had finally approved the software.[67]

---

[62] *See* Docket No. 111, Ex. 14 § 5.1.1.

[63] *See id.*, Ex. 8 at 54:25-55:18.

[64] *See id.*, Ex. 15; Ex. 4 at 54:25-55:5.

[65] *See id.*, Ex. 17.

[66] *See id.*, Ex. 18, 19.

[67] *See id.* at 12.

Case No.: 11-3403 PSG
ORDER

The court must comment that Cisco appears to take conflicting positions as to whether AMC indeed achieved delivery as required by the contract.  While in its own motion for summary judgment, Cisco does not dispute that AMC delivered at least the Siebel Adapter itself,[68] Cisco argues in opposition to AMC's motion that AMC's delivery nevertheless was inadequate.[69]  In any event, what AMC ignores is that its delivery obligation was for a Deliverable, not just the software piece of that Deliverable.  As a result, the missing third-party Oracle certification alone is sufficient issue to deny AMC's summary judgment motion on this claim.  Substantial performance occurs when there was "no willful departure from the terms of the contract, and no omission of any of its essential parts."[70]  While Cisco did not object to that omission at the time of receipt, a reasonable jury could conclude that the Oracle certification was an essential part of the delivery obligation such that without the certification, the delivery did not constitute substantial performance.[71]  Under such circumstances, summary judgment to AMC on this issue is not justified.

### b.   *Rejection and Redelivery*

Cisco is not fortunate, however, as to the remaining aspects of AMC's performance, such that it should prevail on its own motion.  First, while it is undisputed that Cisco sent an error list of 55 issues with the Siebel Adapter software for AMC to resolve,[72] it is very much disputed whether Cisco provided "sufficient detail" in its list of the nonconformance to the specifications to allow

---

[68] *See* Docket No. 103 at 17.  Cisco's 30(b)(6) witness also agreed as much.  *See* Docket No. 111, Ex. 8 at 53:25-54:18.

[69] *See* Docket No. 128 at 10-11.

[70] *In re Kinney Aluminum Co.* 78. F.Supp. 565, 567-68 (S.D. Cal. 1948).

[71] *See id.*

[72] *See* Docket No. 111, Ex. 21.

11

Case No.: 11-3403 PSG
ORDER

AMC to correct the problem.[73]   The sufficiency of the detail of Cisco's list to allow AMC to fix problems is an open question that a reasonable jury could decide in AMC's favor.

AMC might also persuade a reasonable jury as to whether AMC redelivered the Siebel Adapter.  AMC claims that although it did not physically redeliver the Siebel Adapter, the doctrines of tender, prevention, and futility excused AMC's nonperformance and triggered Cisco's duty to perform.

First, AMC contends that its communications to Cisco on November 29 and 30, 2007 constituted a tender of redelivery to Cisco.  Tender, or an offer for full performance, extinguishes the tendering party's obligation to perform and triggers the other party's duty to perform.[74]  It must be made with the intent to extinguish the obligation.[75]  To be operative, the offer must be made in good faith, unconditional, and the party must be willing and able to perform.[76]  On November 29, 2007, AMC's representative Anthony Uliano ("Uliano") called Cisco employees Richard Jefts ("Jefts") and Mike Bergelson ("Bergelson") to inform Cisco of the status of the Siebel Adapter.[77]  According to Uliano, he explained that of the six issues yet unresolved by AMC, four required some kind of input from Cisco, and two others could be easily fixed.[78]  On November 30, 2007, Uliano emailed Jefts and Bergelson providing much of the same information – the email purported

---

[73] *See id.*, Ex. 14 § 3.2.

[74] *See* Cal. Civ. Code §§ 1485, 1486.

[75] *See id.*

[76] *See Arnolds Mgmt. Corp. v. Eischen,* 158 Cal. App. 3d 575, 580 (1984); *See also* Cal. Civ. Code §§ 1493-95.

[77] *See* Docket No. 110-1 ¶¶ 4-5.

[78] *See id.*

Case No.: 11-3403 PSG
ORDER

United States District Court
For the Northern District of California

to deliver "the latest on the Siebel Adapter," with a list of current issues showing six issues remained to be fixed.[79]

Accordingly, there is a question as to whether AMC's offer constituted tender.  While Cisco is quite right that a jury might question AMC's willingness and ability to fully perform if only Cisco would consent, it should be left to the jury to weigh the evidence and determine what was said in that phone conversation, and whether AMC's message was sufficient to effect tender.

Second, AMC argues that even if its performance was not enough to constitute tender, AMC's performance was excused because Cisco prevented it.  "[W]here one contracting party prevents the other's performance of a condition precedent, the party burdened by the condition is excused from performing it, and the benefited party's duty of performance becomes unconditional."[80]  AMC argues that Cisco prevented AMC's performance by initiating the Re-EC process on the Siebel Adapter project.  The Re-EC decision sent the project "back to the drawing board," freezing the project and redistributing committed resources until Cisco re-evaluated the project.[81]  After Cisco made the Re-EC decision, Cisco no longer had any engineers or resources dedicated to working with AMC on the Siebel Adapter project.  Cisco also never responded to AMC's November 14 status report, nor provided the information AMC claims was necessary to complete the revisions.  A reasonable factfinder might conclude that, all of this evidence notwithstanding, in light of the Agreement's purpose, which Cisco argues was to allow Cisco to hire out development of adapters with minimal commitment of internal resources, Cisco did not prevent AMC's redelivery.  But it might not.  Once again, such disputes are best left to the jury to resolve.

---

[79] Docket No. 112, Ex. 29.

[80] *City of Hollister v. Monterey Ins. Co.*, 165 Cal. App. 4th 455, 490 (2008).  *See also* Cal Civ. Code § 1511.

[81] *See* Docket No. 111, Ex. 5 at 79:23-80:7; Ex. 24; Ex. 8 at 89:5-11.

Case No.: 11-3403 PSG
ORDER

**United States District Court**
For the Northern District of California

Third, AMC argues that delivery would have been futile because Cisco had already decided to Re-EC the Siebel Adapter project.  Acts are futile where the defendant has expressly refused to accept performance, the defendant indicates through conduct that it will not accept performance, or performance would otherwise be pointless.[82]  A reasonable jury could find that in light of Cisco's decision to Re-EC the Siebel Adapter, Cisco would not have accepted redelivery of the product.

In sum, the issue of whether either party breached the Agreement with respect to the Siebel Adapter must be presented to a jury.

### 2.  UCCX Connector

The court next turns to AMC's claim that Cisco breached the Agreement by refusing to accept the UCCX Connector.  This claim turns on whether the UCCX Connector was a Deliverable under the Agreement.[83]

Under California law, contract interpretation is a two-step process: first, the court looks to see if there is any "ambiguity" in the contract, or whether the language is "reasonably susceptible to the interpretation urged by a party."[84]  Only in the event that there is an ambiguity does the court proceed to consider the extrinsic evidence in interpreting the contract.[85]

Although other products and standard software were licensed by the parties and included in the royalty payments section, the contract clearly only subjects Deliverables to the development and delivery schedule and the accept-or-reject process.[86]  Under the plain terms of the Agreement,

---

[82] *See Gross v. Raeburn*, 219 Cal. App. 2d 792, 807 (1963), *Sutherland v. Barclays American/Mortgage Corp.*, 53 Cal. App. 4th 299, 312-13 (1997); *Garcia v. World Savings, FSB*, 183 Cal. App. 4th 1031, 1042-43 (2010).

[83] *See* Docket No. 64 at 9.

[84] *In re Facebook DPC Advertising Litigation*, 709 F.Supp.2d 762, 769 (N.D. Cal. 2010) (citing *Wolf v. Superior Court*, 114 Cal. App. 4th 1343, 1351 (2004)).

[85] *See id.*

[86] *See* Docket No. 111, Ex. 14 § 3.2 ("Acceptance: Upon delivery of the Deliverables…"); Ex. A ("Deliverables; Delivery Dates").

Case No.: 11-3403 PSG
ORDER

then, AMC's duty to develop and deliver and Cisco's corresponding duty to accept or reject arises

only where an item is designated a Deliverable.  Thus, even if Cisco licensed the UCCX Connector

software,[87] an obligation to further accept an adapted version of that software does not exist unless

the UCCX Connector is properly characterized as a "Deliverable."

As already discussed, Deliverables are by definition only those projects listed in any

Statements of Work expressly executed by the parties.[88]  The Statement of Work contains the

following summary of products to be developed:

> **Summary of Development**.
> Licensor agrees to modify Licensor's Multi-Channel Integration Suite to interconnect Cisco
> Unified Contact Center, Enterprise and Hosted as well as ICM Enterprise and Hosted with
> the following CRM software:
> - Siebel
> - SAP CRM
> - Microsoft Outlook
> - Microsoft CRM
> - PeopleSoft
> - Salesforce.com[89]

This summary of products to be modified plainly does not include "UCCX" or "Unified Contact

Center Express."

AMC argues that the UCCX Connector was nevertheless a Deliverable under the

Agreement.  AMC submits that there are other references to the UCCX Connector in the Statement

of Work, raising at least a triable inference that the UCCX Connector was intended to be a

Deliverable.  However, the references identified by AMC are scattered and abstract at best.  In

"Acceptance Testing and Acceptance Criteria," the Agreement provides that "Software

interoperability testing will consist of testing the Software in an environment which consists of a

---

[87] The UCCX Connector appears in the Agreement under a list of standard and developed software
to be licensed by Cisco.  *See* Docket No. 111, Ex. 14, Ex. A.  *See also* Docket No. 104, Ex. 3, 4.

[88] *See* Docket No. 111, Ex. 14 § 1.6.

[89] *Id.*, Ex. A § 2.

Case No.: 11-3403 PSG
ORDER

live CCX and CCE system."[90]   AMC argues that this is another name for the Unified Contact

Center Express.   Even if that were true, these statements reference operation testing conditions and

criteria rather than indicate any intent to treat the UCCX Connector as a product to be adapted by

AMC and licensed to Cisco. [91]   The legal maxim "expressio unius est exclusio alterius" applies

here – where a list of Deliverables is explicitly provided, it strains credibility to contend that

abstract references to a product elsewhere in the contract can create ambiguity as to whether it is

also a Deliverable.[92]

          The extrinsic evidence does not create any ambiguity in this plain interpretation, but

supports it.   During negotiation, Cisco and AMC discussed including both UCCE and UCCX

Connectors in the contract.[93]   An earlier draft included both UCCE and UCCX Connectors.[94]

However, Cisco wanted to focus on the UCCE first because of greater demand on that side of the

business and asked AMC to remove the UCCX project.[95]   The parties agreed to remove the UCCX

Connector from the first phase in order to focus on other projects.   AMC's President Uliano sent an

email to Cisco about the first draft, stating: "Also, I thought Express wasn't going to happen in this

phase, so we should probably remove it."[96]   Accordingly, AMC's lawyers made the revision

---

[90] *Id.* § 5.1.1.

[91] *See Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1, 18 (1995) ("language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract.  Courts will not strain to create an ambiguity where none exists.").

[92] *Black v. Richfield Oil Corp.*, 41 F. Supp. 988, 995 (S.D. Cal. 1941) *aff'd* 146 F.2d 801 (9th Cir. 1944).  *See also* Cal. Civ. Code § 3534 ("Particular expressions qualify those which are general"); *Scudder v. Perce*, 159 Cal. 429, 433, 114 P. 571, 573 (1911) ("the familiar rule [is] that when general and specific provisions of a contract deal with the same subject-matter, the specific provisions, if inconsistent with the general provisions, are of controlling force").

[93] *See* Docket No. 104, Ex. 36 at 37:15-39:12.

[94] *See id.*, Ex. 30.

[95] *See* Docket No. 104, Ex. 36 at 37:15-39:12.

[96] *Id.*, Ex. 30.

16

Case No.: 11-3403 PSG
ORDER

United States District Court
For the Northern District of California

editing the term "Unified Contact Center Express, Enterprise" in the "Summary of Development" to read only "Unified Contact Center, Enterprise."[97]   As AMC admits, they made this change because although Cisco wanted the UCCX Connector, it "did not want it immediately."[98]   AMC agrees that the UCCX Connector was "Phase 2" of the project,[99] which implies they knew that the UCCX Connector was not part of any current Statement of Work.

AMC alternatively contends that post-contract communications "modified" the Statement of Work to include the UCCX Connector as a Deliverable.  Section 3.11 provides that "If Cisco desires to engage Licensor for additional services which are not included in the Statement of Work and which do not constitute merely a revision or modification of the Statement of Work, the parties shall in good faith negotiation additional Statements of Work," which must be in writing and signed by party representatives by both sides.[100]   AMC points to an email chain between the two parties as such a revision.  As with any contract, a modification requires mutual assent between the parties, as evidenced by a "reasonable meaning of the words and acts of the parties, and not from their unexpressed intentions or understanding."[101]   The email chain shows that Cisco employee Willem Nijenhuis ("Nijenhuis") stated, "We are going to move ahead with the Connector project for CCX now."[102]   In response, AMC's representative Uliano asked, "Will we start on that phase after this one, or do you want us to try to get it done with this one?" apparently in reference to the

---

[97] See id.; See also id. Ex. 31, Ex. 27.

[98] See Docket No. 134 at 22.

[99] Docket No. 136, Ex. 3.

[100] See id., § 3.11.

[101] 1 Witkin, Summary of Cal. Law (10th Ed. 2005) Contracts, § 116; § 964.  See also Cal. Civ. Code §§ 1550, 1565.

[102] Docket No. 136, Ex. 2.

17

Case No.: 11-3403 PSG
ORDER

UCCE and UCCX Connectors.[103]  Nijenhuis then responded, "That's one of the many questions we need to answer.  It's probably too[] late to really let in run parallel with the CEE one, but I'd like to have it follow as close as possible."[104]  Lastly, Uliano responded "I think with all the work we're doing, we should be able to immediately move on to the IPCC-X phase.  I'll talk to the team and get back to you."[105]  There is no evidence in this email exchange that can be construed as mutual assent, either to create a modification in the current list of Deliverables or to add another Statement of Work to include the UCCX Connector as a Deliverable.  Uliano even explicitly says "I'll… get back to you," rather than words of assent, even on AMC's part.  With no offer, acceptance, and mutual assent that Cisco can point to, there can be no modification or Statement of Work establishing the UCCX Connector as a Deliverable.[106]

Even if the UCCX Connector were somehow construed to be an Agreement Deliverable, AMC cannot prove that it delivered all of the components required to trigger Cisco's corresponding duties under the contract.  AMC contends that it delivered a CD containing both the UCCE and UCCX Connectors.  But as noted previously, delivery requires not only delivery of the software, but also specifications, test results, and third-party certification.  AMC cannot establish that it completed those steps, meaning it never completed delivery and Cisco had no obligation to accept or reject.  Under the facts presented, even viewing the evidence in the light most favorable to AMC, no reasonable jury could conclude that Cisco breached an express term of the contract by failing to accept the UCCX Connector.  For these reasons, summary judgment in favor of Cisco must be granted on AMC's breach of contract claim with respect to the UCCX Connector.

---

[103] *Id.*

[104] *Id.*

[105] *Id.*

[106] *See American Bldg. Maintenance Co. v. Indem. Ins. Co. of North America*, 214 Cal. 608, 615 (1932).

18

Case No.: 11-3403 PSG
ORDER

**B.**     **AMC's Breach of Implied Covenant of Good Faith and Fair Dealing Claims**

AMC brings four claims against Cisco for breach of the implied covenant of good faith and fair dealing.  Both AMC and Cisco seek summary judgment on these claims, again raising the question of whether a reasonable jury could decide in either party's favor.  The implied covenant "imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."[107]  The implied covenant "is aimed at making effective the agreement's promises."[108]  A plaintiff can show this by demonstrating "a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement."[109]

**1.**     **Failing to provide customers with AMC's maintenance releases and updates**

The court previously dismissed this claim with leave to amend, finding that Section 3.7 of the Agreement does not provide for any obligation for Cisco to distribute AMC's maintenance releases and updates.  The Agreement merely requires AMC to provide Cisco with maintenance releases and updates, but does not say why.[110]  AMC argues that while there is no express obligation for Cisco to distribute releases and updates to customers, Cisco had an implied obligation to do so.  But AMC does not provide any evidence supporting this skeletal theory.  AMC states only that Cisco's failure to distribute AMC releases "caused customers to complain to

---

[107] *Foley v. Interactive Data Corp.,* 47 Cal. 3d 654, 683 (1988).

[108] *Id.*

[109] *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (Ct. App. 1990).

[110] *See* Docket No. 111, Ex. 14 § 2.2.

Case No.: 11-3403 PSG
ORDER

AMC about software problems."[111]  While surely an inconvenient result for AMC, AMC has

provided no evidence as to why a failure to distribute updates to customers unfairly frustrates the

reasonable expectations under the agreement.[112]  Summary judgment here in Cisco's favor is

warranted.

### 2. Failing to comply with the provision in the Agreement requiring Cisco to accept or reject the AMC Siebel Adapter

This claim overlaps with the breach of contract claim regarding the Siebel Adapter.  "If the

allegations do not go beyond the statement of a mere contract breach and, relying on the same

alleged acts, simply seek the same damages or other relief already claimed in a companion contract

cause of action, they may be disregarded as superfluous as no additional claim is actually

stated."[113]  As a result, to the extent that AMC contends here that Cisco failed to accept or reject

the Siebel Adapter in the same way that it asserts Cisco breached the contract by engaging in the

same, Cisco is entitled to summary judgment.

### 3. Making false promises with respect to the development of the Siebel Adapter

Cisco argues that statements made about Cisco's intent to transfer customers from the Cisco

Siebel Adapter to the AMC Siebel Adapter made before the parties executed the Agreement are not

actionable.  The court agrees.  The implied covenant does not exist prior to the contract, so it does

not require the parties to "negotiate in good faith prior to any agreement."[114]  Thus, statements

made only in negotiation, prior to any contract, occurred when no contractual duties existed and

therefore cannot form the basis for an implied covenant claim.  Once again, summary judgment in

Cisco's favor is warranted.

---

[111] Docket No. 134 at 20.

[112] *See Careau & Co.*, 222 Cal. App. 3d at 1395.

[113] *Id.*

[114] *McClain v. Octagon Plaza, LLC*, 159 Cal. App. 4th 784, 799 (2008).

20

Case No.: 11-3403 PSG
ORDER

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 4.     Denying AMC the fundamental benefits of the Agreement with respect to the UCCX Connector

AMC's main implied covenant claims center on whether Cisco in bad faith denied AMC the opportunity to reap royalty payments, as provided for in the contract, for both the Siebel Adapter and the UCCX Connector.  The Agreement provides that Cisco if developed software is accepted, Cisco must pay AMC a set amount to compensate AMC for non-recurring engineering costs, as well as a prepaid royalty amount.[115]  There is no express obligation for Cisco to market or sell the products.  However, in the event that Cisco did sell the products, Cisco agreed to pay AMC additional royalty payments and maintenance fees.[116]

#### a.     *Siebel Adapter*

AMC argues that Cisco frustrated this possibility of additional payments by completely refusing to work with AMC on the Siebel Adapter project.  While Cisco again argues that it is not expressly required to provide any additional resources other than those specified in the Agreement, if "cooperation of the other party is necessary for successful performance of an obligation, a promise to give that cooperation… will often be implied."[117]  While the express terms do not require additional resources from Cisco, they do not preclude additional resources.  In fact, the Agreement specifically contemplates the possibility that Cisco may provide additional resources:

> **Cisco Property:**
> 4.8.1. During the term of this Agreement, Cisco may provide equipment, designs, materials, software and other property of Cisco, including any and all pre-existing technology of

---

[115] *See* Docket No. 111, Ex. 14 § 3.2, 3.3.

[116] *See id.* § 3.4.

[117] 1 Witkin, Summary of Cal. Law, Contracts § 798 (10th Ed. 2005).

Case No.: 11-3403 PSG
ORDER

Cisco (collectively "Cisco Property") to Licensor for its use in fulfilling its obligations hereunder.[118]

More fundamentally, though, both parties have presented evidence as to whether Cisco denied basic information necessary to complete the project.  For example, AMC submits evidence that it needed Cisco's existing Siebel Driver to make certain technical changes,[119] as well as evidence of internal decisions by Cisco to discontinue the project and Cisco's failure to respond to AMC requests for information.  Cisco in turn offers evidence that it sent AMC all necessary information, including a copy of its existing Siebel Driver.[120]  A reasonable jury could go either way on this question of whether Cisco frustrated the purpose of the Agreement, which requires that jury and not the undersigned to resolve this issue.

### b.   *UCCX Connector*

AMC also asserts that Cisco violated the implied covenant by not pursuing the UCCX Connector project.  As established previously, under the Agreement Cisco appears to have had a non-exclusive license to the UCCX Connector, but the parties did not set the project in motion.  Unlike the Siebel Adapter, the UCCX was not a Deliverable.  Cisco did not contract AMC to develop the UCCX Connector, and so does not have any implied obligations to cooperate with AMC regarding development of the UCCX Connector.  AMC suggests that licensing the product, standing alone, creates an obligation to sell the product.  But this theory of the implied covenant must be rejected because the implied covenant must rest upon "the existence of some specific contractual obligation."[121]  This is because the implied covenant is limited to ensuring that the parties receive the benefits of their agreement.[122]  Merely accepting a non-exclusive license to a

---

[118] *See id.* § 4.8.

[119] *See* Docket 134, Ex. 6 at 232:13-16; Ex. 1 at 273:13-275:5; Ex. 14 at 73:10-75:21.

[120] *See* Docket No. 129, Ex. 7 at 161:5-17; Ex. 14 at 266:13-269:18, 273:13-274:2; Ex. 15; Ex. 16.
[121] *Racine & Laramie, Ltd. v. Dep't of Parks & Recreation*, 11 Cal. App. 4th 1026, 1031 (1992).

Case No.: 11-3403 PSG
ORDER

product does not give rise to a "specific contractual obligation" to hire AMC to develop a modified version of that product, and then go on to sell that product to others.[123]   AMC also was free to sell the product to others, differentiating this case from others where a covenant to sell was implied.[124] Summary judgment in favor of Cisco on this issue is warranted.

## C.   **Cisco's Counterclaims**

AMC alone moves for summary judgment on Cisco's counterclaims.  Cisco's first counterclaim is that AMC breached the contract by (1) failing to deliver the Siebel Adapter and (2) prematurely terminating the Agreement.  As to the first ground for breach, as discussed above there is a disputed issue of material fact of whether AMC delivered the Siebel Adapter.  As to the second ground for breach, AMC contends that because Cisco was in breach of the contract, it cannot argue that AMC's termination was premature.  However, as also noted in the above discussion, it is disputed whether Cisco breached the contract.  If a jury were to find that Cisco did not breach, it could also find that AMC's termination was unjustified.  Summary judgment is thus improper.

As its second counterclaim, Cisco also asserts AMC breached the implied covenant of good faith by "failing to dedicate sufficient infrastructure and manpower resources to fulfill its development and testing obligations for the AMC Siebel Adapter pursuant to the terms of the OEM Agreement."[125]   Cisco has presented evidence raising at least a disputed issue of fact as to whether

---

[122] *See Careau & Co.*, 222 Cal. App. 3d at 1395.

[123] *Cf. Locke v. Warner Bros., Inc.*, 57 Cal. App. 4th 354, 358 (1997) (holding that where Warner Bros. paid Locke for a first look deal whereby Locke was required to submit any movie project to Warner Bros. first before submitting to other studios, and Warner Bros. had accepted Clint Eastwood's offer to reimburse Warner Bros. so long as it categorically refused all of Locke's submissions, Warner Bros. breached the implied covenant because it had a express contractual duty to consider Locke's proposals in good faith).

[124] *Cf. Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 91 (1917) (holding that plaintiff's "sole compensation for the grant of an exclusive agency is to be one-half of all the profits" resulting from the defendant's sales, so the defendant had an implied duty to use "best efforts" to create sales).

[125] Docket No. 128 at 23.

Case No.: 11-3403 PSG
ORDER

United States District Court
For the Northern District of California

AMC did so.  For example, AMC's own employees admitted to sometimes overcommitting and missing deadlines.[126]  Additional evidence discussed above supports Cisco's contention that AMC's delivery was far from perfect.  It would be reasonable, therefore, for a jury to conclude that AMC did not follow the contract in good faith.

## IV.   CONCLUSION

AMC's motion for summary judgment is DENIED.  Cisco's motion for summary judgment is GRANTED as to AMC's breach of contract claim regarding the UCCX Connector, but DENIED as to the Siebel Adapter.  Cisco's motion for summary judgment as to AMC's claims for breach of the implied covenant is GRANTED as to claims based on Cisco's failure to provide upgrades and release updates to customers, GRANTED as to claims based solely on Cisco's failure to adhere to the accept-or-reject provision for the Siebel Adapter, GRANTED as to the UCCX Connector, but DENIED as to Cisco's failure to cooperate on the Siebel Adapter.

**IT IS SO ORDERED.**

Dated:  July 11, 2013

_____
PAUL S. GREWAL
United States Magistrate Judge

---

[126] *See* Docket No. 129, Ex. 6 at 198:9-20, 227:5-13; Ex. 3 at 223:3-224:5; Ex. 5; Ex. 3 at 220:23-221:18.

24

Case No.: 11-3403 PSG
ORDER