UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| AMC TECHNOLOGY, LLC,<br><br>                 Plaintiff,<br>    v.<br><br>CISCO SYSTEMS, INC.,<br><br>                 Defendant. | Case No.: 11-cv-3403 PSG<br><br>**ORDER DENYING AMC'S MOTION FOR SANCTIONS**<br><br>**(Re: Docket No. 117)** |

Ten years after Judge Scheindlin woke up the legal world from its electronic discovery slumber in the *Zubulake* series, plenty of other courts now have weighed in on when the duty to preserve electronic evidence attaches.[1]  With varying degrees of sophistication, most parties have gotten the basic message: the duty begins at least no later than the day they are sued and told about it.  Less understood is exactly what a party must then do and by when.  For example, while a suit against a particular CEO for sexual harassment would pretty clearly require that his relevant data be locked down at least by the time the company gets wind of the complaint, what must counsel do about less obvious players in a more abstract dispute?  The motion before the court presents just such a question.

---

[1] *See, e.g., Hynix Semiconductor v. Rambus Inc.*, 645 F.3d 1336, 1345 (Fed. Cir. 2011); *Apple Inc. v. Samsung Electronics Co., Ltd.*, 881 F. Supp. 2d 1132, 1138 (N.D. Cal. 2012); *In re Napster, Inc. Copyright Litigation,* 462 F. Supp. 2d 1060, 1078 (N.D. Cal. 2006); *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 509 (D. Md. 2009).

1

Case No.: 11-3403 PSG
ORDER

Plaintiff AMC Technology, LLC ("AMC") seeks adverse inference sanctions against Defendant Cisco Systems, Inc. ("Cisco"), arguing that Cisco wrongfully failed to preserve the data of employee Terry McKeon ("McKeon").[2] Cisco opposes. The parties appeared for oral argument. Having considered the papers and arguments of counsel, the court DENIES the motion for sanctions.

Some background is in order. Cisco manufactures and sells software for customer contact centers, including a product called the Unified Contact Center Express ("UCCX"). AMC designs software "connectors" allowing customers to integrate Cisco's software with consumer relationship management ("CRM") software supplied by third parties. In 2007, Cisco and AMC entered into a software development and licensing agreement ("Agreement") whereby AMC agreed to adapt some of its existing software products for Cisco to license and sell under its own brand.[3] AMC was to provide a number of "Deliverables" under the Agreement, such as the Siebel Adapter. AMC asserts the Unified Contact Center Express Connector ("UCCX Connector") was also a "Deliverable." Cisco vigorously disputes this.

McKeon was a product manager at Cisco.[4] McKeon was not on the Cisco team negotiating the Agreement between AMC and Cisco,[5] which was spearheaded by Willem Nijenhuis ("Nijenhuis").[6] While Nijenhuis computed the royalty payment schedule for the Agreement and created an ROI spreadsheet forecasting sales of the AMC UCCX Connector should Cisco decide to market it,[7] McKeon nevertheless contributed UCCX sales data to inform this calculation[8] and

---

[2] *See* Docket No. 103.

[3] *See* Docket No. 111, Ex. 14.

[4] *See* Docket No. 107, Ex. 4 at 11:22-25.

[5] *See id.* at 108:1-4.

[6] *See* Docket No. 104, Ex. 36.

[7] *See* Docket No. 126, Ex. 2 at 102:7-105:1; Docket No. 107-2, Ex. 1 at 111-143.

2
Case No.: 11-3403 PSG
ORDER

AMC speculates that McKeon may have otherwise aided Nijenhuis. McKeon generally kept track of his work through spreadsheets stored on his computer and company email.[9] He provided information to Nijenhuis through telephone calls and emails.[10] McKeon retired from Cisco on July 7, 2011.[11]

Four days later, on July 11, 2011, AMC filed this suit against Cisco.[12] On November 3, 2011, the parties began exchanging custodial information and notices to preserve data.[13] Neither party listed McKeon in its initial notifications of persons who might have relevant data and whose data should be preserved.[14] But on July 17, 2012, AMC requested custodial data for McKeon.[15] Unfortunately, Cisco could not comply because when McKeon had retired he had not been sent a preservation notice.[16] Pursuant to company protocol, Cisco's IT department reformatted McKeon's laptop and deleted his email archives thirty days after his departure.[17]

---

[8] *See* Docket No. 107, Ex. 4 at 133:5-15.

[9] *See id.* at 138:1-22.

[10] *See, e.g.,* Docket No. 107, Ex. 19, 20, 21, 22, 23.

[11] *See* Docket No. 107, Ex. 4 at 15:25-16:13.

[12] *See* Docket No. 1.

[13] *See* Docket No. 126 ¶ 9, Ex. 15.

[14] *See* Docket No. 126, Ex. 8, 9.

[15] *See* Docket No. 126, Ex. 13.

[16] *See* Docket No. 127, Ex. 14, 22.

[17] *See* Docket No. 107, Ex. 23, 24.

3

Case No.: 11-3403 PSG
ORDER

United States District Court
For the Northern District of California

And so now AMC seeks sanctions, in the form of a series of adverse inference instructions establishing Cisco's liability for the UCCX Connector,[18] for what it characterizes as reckless destruction of documents created by a key decisionmaker.

The court has "inherent discretionary power to make appropriate evidence rulings in response to the destruction or spoilation of relevant evidence," which arises out of its inherent power to direct "orderly and expeditious disposition of cases."[19] The range of appropriate sanctions is broad, and may take form in relatively minor sanctions, such as the award of attorney's fees, to more serious sanctions, such as dismissal of claims or instructing the jury that it may draw an adverse inference.[20] The court's discretion is not, however, unbounded – it must weigh a number of factors to determine whether to grant sanctions, and if so, tailor the remedy according to the conduct that triggered the sanction.[21] To determine whether to award spoiliation sanctions, the court considers whether the moving party has established: "(1) that the party having control over

---

[18] AMC seeks the following adverse inference instructions, *see* Docket No. 117:

1. Cisco understood it was licensing, and intended to license, AMC's UCCX Connector under the OEM Agreement;
2. Cisco was obligated under the OEM Agreement to timely proceed with the UCCX Connector;
3. Cisco was obligated under the OEM Agreement to cooperate with AMC in development of the UCCX Connector;
4. Development, acceptance, and resale of the UCCX Connector by Cisco did not require an additional, revised, or different Statement of Work;
5. As of execution of the OEM Agreement, Cisco and AMC understood that development of the UCCX Connector would proceed on a schedule to meet a resale date of no later than August 2008;
6. After execution of the OEM Agreement, Cisco instructed AMC not to perform with respect to the UCCX Connector;
7. Cisco failed to cooperate with AMC regarding development and resale of the UCCX Connector; and
8. The sales projections contained in Cisco's ROI spreadsheet constitute an accurate and reasonable basis upon which AMC's UCCX Connector damages may be calculated.

[19] *Apple*, 881 F. Supp. 2d at 1135 (quoting *Glover v. BIC Corp.,* 6 F.3d 1318, 1329 (9th Cir. 1993)).

[20] *See id.*

[21] *See id.*

4

Case No.: 11-3403 PSG
ORDER

the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."[22]

**Question No. 1: Did Cisco Have an Obligation to Preserve the McKeon Documents at the Time it Destroyed Them?**

There is no question that after AMC specifically requested McKeon's documents, Cisco had a duty to preserve them.[23] By that point, however, McKeon had already left Cisco for over a year and his information had long since been erased. The issue, then, is whether a duty to preserve arose on or before the day his documents had been wiped pursuant to routine company policy.

A general duty to preserve evidence relevant to the litigation arises from the moment that litigation is reasonably anticipated.[24] Because Cisco received notice of the complaint before McKeon's documents were destroyed,[25] and concedes that it had notice of the suit even before AMC filed the complaint on July 11, 2011,[26] Cisco had a general duty to preserve evidence when it destroyed McKeon's documents.

---

[22] *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003); *see also Apple Inc. v. Samsung Electronics Co., Ltd.*, 881 F. Supp. 2d at 1138; *In re Napster,* 462 F. Supp. 2d at 1078; *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d at 509.

[23] *See Sampson v. City of Cambridge, Md.*, 251 F.R.D. 172, 181 (D. Md. 2008) ("[i]t is clear that defendant had a duty to preserve relevant evidence that arose no later than [] when plaintiff's counsel sent the letter to defendant requesting the preservation of relevant evidence, including electronic documents").

[24] *Apple,* 881 F. Supp. 2d at 1136.

[25] Although McKeon retired on July 7, 2011, four days before AMC filed the complaint, Cisco's policy is to erase emails only after thirty days have passed. *See* Docket No. 107, Ex. 23, 24.

[26] *See* Docket No. 125 at 10.

5
Case No.: 11-3403 PSG
ORDER

But the scope of this duty is not limitless. A litigant has an obligation to preserve only evidence "which it knows or reasonably should know is relevant to the action."[27] This duty requires a party to "identify, locate, and maintain, information that is relevant to specific, predictable, and identifiable litigation," which includes identifying "key players" who may have relevant information and taking steps to ensure that they preserve their relevant documents.[28] It is critical to underscore that the scope of this duty is confined to what is reasonably foreseeable to be relevant to the action.[29] Requiring a litigant to preserve all documents, regardless of their relevance, would cripple parties who are often involved in litigation or are under the threat of litigation.[30]

AMC's complaint plainly put Cisco on notice to identify and preserve documents that generally might reasonably be relevant to the AMC-Cisco Agreement, the Siebel Adapter, and the UCCX Connector.[31] But should Cisco have known specifically that McKeon was a "key player," such that his documents, just days before their demise, were relevant to the case? McKeon was an unlikely candidate to have documents relevant to the Agreement because he did not engage in negotiations of the Agreement in any way. Nor did he work on any internal committees deciding whether to commence the UCCX Connector project.[32] He was merely the product manager for the

---

[27] *In re Napster,* 462 F. Supp. 2d at 1067.

[28] *Apple*, 881 F. Supp. 2d at 1137. *See also Zubulake*, 220 F.R.D. at 218 (further requiring counsel to issue and periodically re-issue litigation holds and to instruct all employees to produce relevant, active files and identify, segregate, and safely store relevant backup tapes).

[29] *See Apple*, 881 F. Supp. 2d at 1145. *See also Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) (holding that a party must have "some notice that the documents were *potentially* relevant to the litigation before they were destroyed" to engage in willful spoliation) (emphasis original).

[30] *See Zubulake*, 220 F.R.D. at 217.

[31] *See id.* at 216. *See also* Docket No. 1.

[32] *See* Docket No. 126, Ex. 5 at 27:10-24, 82:15-21, 87:2-88:14, 107:11-108:4, 130:23-24, 173:7-22, 175:5-20, 224:8-23.

6
Case No.: 11-3403 PSG
ORDER

underlying Cisco UCCX product. Although McKeon's input might have informed Nijenhuis' computation of the royalty schedule in the Agreement, which might be relevant to the issue of damages, these documents are only tangentially related to even that question because AMC does not allege that the royalty payment schedule was incorrect. Nothing in the complaint suggests that AMC would be making such a claim. Because Cisco could not reasonably have known that McKeon's documents would be at all relevant to the litigation when those documents were destroyed, there was no duty to preserve them at that time.

**Question No. 2: Did Cisco Destroy the Records with a Culpable State of Mind?**

AMC asserts that Cisco destroyed the McKeon documents with a culpable state of mind. A party acts with a culpable state of mind when it consciously disregards its litigation duty to preserve information.[33] Here, the disposal of McKeon's documents appears to have been routine – Cisco followed established company procedure, which deletes company emails and information within thirty days. Cisco did not act in conscious disregard of its litigation preservation duties because again, the filing of the suit did not reasonably put Cisco on notice to preserve McKeon's documents given McKeon's tangential relationship to the Agreement. Not only did he not participate in negotiations for the Agreement, he also did not work directly on the UCCX Connector project. Further, Cisco produced many communications sent to and from McKeon held by other document custodians and of the same subject matter, which suggests Cisco did not act with a conscious disregard for documents relating to McKeon.[34]

**Question No. 3: Was the Evidence Was Relevant to AMC's Claims or Defenses?**

Before the court imposes sanctions, it is imperative that the moving party show that the missing evidence would have had some relevance to the proceedings.[35] "The burden is on the

---

[33] *See Apple,* 881 F. Supp. 2d at 1147.

[34] *See, generally,* Docket No. 126.

7

Case No.: 11-3403 PSG
ORDER

aggrieved party to establish a reasonable possibility, based on concrete evidence rather than a fertile imagination that access to the lost material would have produced evidence favorable to his cause."[36] In evaluating the relevancy of the destroyed documents, courts have considered whether the documents involved a key decision-maker or witness, whether the subject matter of the documents overlapped with the subject matter of the litigation, and whether the documents were created during the relevant time period.[37]

Although McKeon's documents were created during the relevant time period, as the court has already stressed, he did not play any role in negotiating the Agreement. He also did not participate in Cisco's internal Concept Commit or Execute Commit processes for the project, if any, which might have informed decisionmaking on a potential UCCX Connector with AMC.[38] As a result, it is unlikely that he had any documents relevant to the question of whether Cisco breached the Agreement regarding the UCCX Connector. AMC contends the financial documents McKeon provided to Nijenhuis, which might have informed the royalty payments schedule, are nevertheless relevant to calculations of damages. But these documents do not appear to be unique. McKeon used a typical method to compute UCCX sales data, yielding information readily available from other sources.[39] In fact, Cisco has already provided AMC with its internal financial spreadsheets of UCCX sales, which are likely to be the ones created by McKeon.[40] The court is therefore hard-pressed to find that AMC is prejudiced by the loss of McKeon's data.

---

[35] *See Gates Rubber Co. v. Bando Chem. Industries, Ltd.*, 167 F.R.D. 90, 104 (D. Colo. 1996).

[36] *Id.*

[37] *See Nursing Home Pension Fund v. Oracle Corp.*, 254 F.R.D. 559, 566 (N.D. Cal. 2008); *Apple*, 881 F. Supp. 2d at 1147; *In re Napster*, 462 F. Supp. 2d at 1075.

[38] *See* Docket No. 126, Ex. 5 at 27:10-24, 82:15-21, 87:2-88:14, 107:11-108:4, 130:23-24, 173:7-22, 175:5-20, 224:8-23.

[39] *See id.* at 23:3-24:16 (Nijenhuis used a similar method of locally archiving sales data).

[40] Docket No. 126, Ex. 17.

8
Case No.: 11-3403 PSG
ORDER

Even if the documents' tangential relevance to damages warranted imposing some sanctions, which it does not, the adverse inferences sought by AMC establishing Cisco's full liability for breach regarding the UCCX Connector are wholly inappropriate. Sanctions of the kind urged by AMC have similar effect to default judgment and should only be awarded with "very great restraint."[41] On the record presented, the requested sanctions would be disproportionate and unfair, and so the motion must be DENIED.

**IT IS SO ORDERED.**

Dated:  July 15, 2013

                                      PAUL S. GREWAL
                                      United States Magistrate Judge

---

[41] *Gates Rubber*, 167 F.R.D. at 106-07.

9

Case No.: 11-3403 PSG
ORDER